IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Richard P. Matsch

Civil Action No. 12-cv-2134-RPM

DARWIN MORRIS,

    Plaintiff,

v.

DEPUTY SHERIFF NATHAN OPSAHL, in his individual capacity; and
SHERIFF OF SUMMIT COUNTY, COLORADO, in his official capacity,

    Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Plaintiff Darwin Morris was seriously injured on April 26, 2011 when a police canine under Defendant Nathan Opsahl's control bit Morris' neck. Opsahl is a Deputy Sheriff in Summit County; he has been sued in his individual capacity. Morris has also sued Opsahl's employer, the Sheriff of Summit County ("the Sheriff"), in his official capacity. Morris alleges that the Sheriff is liable because the Sheriff's deliberately indifferent policies, training, and customs concerning the use of police canines, as well as his ratification of Opsahl's conduct, caused Morris' injuries. The Sheriff has moved for summary judgment, asserting that municipal liability does not attach here.

The Sheriff treats the allegations in this paragraph as true for the purposes of this Motion. Morris alleges that on the evening of April 26, 2011, Summit County Communications received a call of a burglary and assault at a residence in Silverthorne. The culprits were

reported as armed and fleeing on foot.  Four law enforcement officers, including Opsahl, were dispatched to investigate; Opsahl took the lead along with his German Shepherd K-9 Unit dog, "Bobby," whom Opsahl commanded to engage in a track.  Bobby was on a 30-foot leash.  Bobby led the officers to a car parked a short distance away from the residence. Three men were inside, one of whom was Morris.  The officers drew their weapons and ordered the men out of the vehicle.  Morris then exited the car with his hands in the air. Opsahl ordered Morris to get down on the ground.  Morris got on his knees and was reaching his hands out to prostrate himself, at which point Bobby charged Morris and sunk his teeth into Morris' neck.[1]  Bobby continued to bite Morris' neck even though Opsahl used a release command twice.   In trying to get control of Bobby, Opsahl accidentally discharged his firearm into the ground; the bullet did not strike anyone.   Morris was then taken to the hospital, where he was treated for severe neck injuries.  He was hospitalized from April 27 through May 11, 2011.

The following facts are material and not in genuine dispute.  Following the incident with Morris, Summit County Sheriff John Minor asked the District Attorney with jurisdiction over Summit County to review the incident and placed Opsahl on paid administrative leave until the completion of that review.  [*See* Doc. 37, Ex. 15 at 5 (restricted).]   Following his investigation, the District Attorney determined that Opsahl used reasonable and appropriate force in deploying Bobby, and declined to file charges against Opsahl.  [*See* Doc. 32, Ex. G.] The Sheriff did not conduct an internal affairs investigation into Opsahl's use of Bobby, though he did assign Captain Jaime FitzSimons to investigate Opsahl's accidental discharge

---

[1] The parties dispute whether Bobby bit Morris because Opsahl released Bobby on a track and failed to give a countermanding order for Bobby not to bite; or because Opsahl commanded Bobby to attack Morris once the track ended when they came upon the car.

of his firearm.  FitzSimons concluded that although Opsahl's discharge was negligent, he did not violate Sheriff's policy.  [*See* Doc. 37, Ex. 15 at 15-16 (restricted).]  FitzSimons recommended that Opsahl attend a 4-hour remedial tactical canine deployment training class [*id.* at 16], which included:  assessing whether a canine deployment complies with the law and applicable policy; developing a tactical plan with other officers before deploying a canine; and training Bobby to work around gunfire and other distractions [Doc. 37, Ex. 16 at 1-2].   On July 29, 2011, the Sheriff gave Opsahl a written warning and required him to attend the class.  [*See id.* at 17.]

Two Sheriff's Department policies are relevant to Morris' municipal liability claim.  The Sheriff's "505 Use of Force" policy ("Policy 505") provides:

**VI. Use of Force:**
A. Law enforcement situations are dynamic, rapidly evolving, and unpredictable. The Officer permits deputies to use any method they may choose to defend themselves or another person or affect an arrest or reasonably believed by the deputy, given the facts and circumstances known at the time, to be the amount of force necessary. Deputies shall not use more force than is reasonably necessary to subdue and apprehend a suspect. Appropriate medical attention shall be rendered following the use of physical force, chemical agents, impact weapons, less-lethal weapons and deadly weapons.

B. A deputy is justified in using reasonable and appropriate physical force upon another person when and to the extent that he/she reasonably believes it necessary:

> 1. To effect an arrest, detain or to prevent the escape from custody of an arrested person, unless the deputy knows that the arrest is unauthorized, or

> 2. To defend the deputy or a third person from what he/she reasonably believes to be the use of imminent use of physical force while effecting or attempting to effect such as arrest, or while preventing or attempting to prevent such an escape. (CRS 13-1-707)

[Doc. 32, Ex. B at 2, § VI.A.-B.]

Policy 505 identifies and categorizes different levels of force.  "Artificial Incapacitators" such as chemical agents and stun guns are the lower level of force.   Police dogs are

considered "Intermediate Weapons" along with batons, improvised weapons, and vascular neck restraints. "Deadly Force" is naturally the highest level. [*See id.* at 3, § VI.C.]

Policy 505 establishes reporting requirements related to the use of force [*see id.* at 3, §VI.D.] and the use of excessive force [*see id.* §VI.E.].[2] If an officer witnesses the use of excessive force by another officer, the witnessing officer must report the incident immediately to his/her supervisor and write a memorandum within ten days describing the use of force and the attending circumstances. The supervisor receiving the excessive force report and memorandum then initiates a review of the incident. Failure to report excessive force is a class-one misdemeanor and subjects the officer to administrative sanctions. [*See id.* at §VI.E.1-3.]

The Sheriff's "935 Canine Program" policy ("Policy 935") requires police canines to be certified by an independent trainer and undergo initial training of up to 14 weeks and then have routine maintenance training thereafter. [*See* Doc. 32, Ex. C at 2, § III.E.] Consistent with that policy, Bobby was initially trained for 14 weeks at Von Liche Kennels in Indiana, trains roughly 15-20 hours per month with Opsahl, and is re-certified on a yearly basis by state and national certification organizations. The other canine in Summit County, Tommy, who is handled by Sergeant Brian Smith, the Department's K-9 Supervisor, receives equivalent training. Opsahl received initial K-9 training in the police academy and then attended 40 hours of K-9 SWAT school in 2009. He was certified as a canine handler by the Colorado Canine Police Association in April 2011. Plaintiff's expert on police practices and standards, Ernest Burwell, acknowledged that Opsahl was trained that it is impermissible to

---

[2] "Force" is defined under the Policy as "[a]ny action taken to alter, impede, disrupt, or stop the actions of another." "Excessive Force" means "[p]hysical force which exceeds the degree of physical force permitted pursuant to section 18-1-707 to a person who has been rendered incapable of resisting arrest."

use force on a fully compliant suspect.  [*See* Doc. 32 at 7 (quoting Burwell Dep., Ex. D at

129:21-131:1).]

Policy 935 explicitly identifies the circumstances in which canines may be used, as

follows:

> G. Summit County canines shall not be deployed off-leash to apprehend persons
> except when the handler has probable cause to believe that one of the following
> circumstances is present:
>
>> 1. The suspect is actively resisting arrest;
>>
>> 2. The canine is being assaulted;
>>
>> 3. A person is attempting to evade arrest by flight, who is suspected of a
>> felony or of a misdemeanor when the misdemeanor offense involves an act or
>> threatened act of violence; or
>>
>> 4. To prevent any person from assaulting the canine handler, another policy
>> officer, deputy, or citizen.
>> . . .
> I. When determining whether to deploy a canine, the canine handler shall consider the
> following three criteria:
>
>> 1. The severity of the crime involved;
>>
>> 2. Whether the suspect poses an immediate threat to the safety of law
>> enforcement or citizens; and
>>
>> 3. Whether the suspect is actively resisting arrest or attempting to escape from
>> apprehension.
>
> J. When practical, an audible canine warning shall be given before the beginning of
> an off-leash search.

[*Id.* at 3, § IV.G., I., J.]  In reference to Policy 505, the canine policy states:

> The deployment of a Summit County canine by its handler in the performance of his/her
> duties may, depending upon the circumstances, be considered a use of force. When
> Summit County canines are utilized to neutralize an assault, overcome resistance of
> suspects or arrestees in the defense of personnel or another person, or to locate and
> apprehend a suspect attempting to elude capture, the use of force policy shall apply.

[*Id.* at 1, § II (underline added).]  Each canine handler must maintain a canine working manual, which contains daily logs and other detailed information concerning the use of canines.  [*Id.* at 2, § III.C.]

 "A municipality may not be held liable under §1983 solely because its employees inflicted injury on the plaintiff," *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotations omitted); only "its own unconstitutional or illegal policies" can supply the basis for liability, *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).  For municipal liability to attach, a plaintiff must establish the following elements: "(1) official policy or custom, (2) causation, and (3) state of mind."  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).

Proof of an official policy or custom may take the form of:

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson*, 627 F.3d at 788 (alteration in original) (quotations omitted).

 "To establish the causation element, the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right."  *Schneider*, 717 F.3d at 770 (quotations and citation omitted).  This requirement is satisfied "if the plaintiff shows that 'the municipality was the 'moving force' behind the injury alleged.'"  *Id.*  (quoting *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 404 (1997)).

To meet the state of mind requirement, the plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Schneider*, 717 F.3d at 770 (quoting *Brown*, 520 U.S. at 407). This standard "may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143 F.3d at 1307.

Morris premises his municipal liability claim against the Sheriff on four theories: (1) unconstitutional policies, (2) inadequate training, (3) informal customs and practices, and (4) ratification. [*See* Doc. 37 at 2.]

1. The Sheriff's policies

Morris argues that the Sheriff's use of force and canine deployment policies are constitutionally deficient because: (a) they provide misleading and incorrect instruction with respect to where a canine falls on the use-of-force continuum; (b) the policies allow K-9 handlers to exercise complete discretion on deployment, while simultaneously providing inadequate information and guidance regarding proper deployment procedures, tactical plans, or instructions to other officers when working around canines, and (c) the policies also allow for handlers to have their gun drawn (rather than holstered) while their canine is deployed. [*Id.* at 17-18.]

In Morris' view, characterizing a dog as only an "intermediate weapon," as Policy 505 does, is a constitutionally deficient policy. In support, Morris cites the report of D.P. Van Blaricom, his expert in police practices, which states that the use of canines should be "placed above an impact weapon (baton strikes or impact projectiles) and just below deadly force as it is likely to cause permanent disfiguring injury." [*Id.* at 18 (quoting Ex. 9 at 10).]

Morris also points out that the International Association of Chiefs of Police ("IACP"), the "industry standard" regarding police practices, places canine bites as a "high level of force – one that is a step below deadly force on the force continuum." [*Id.*]

Policy 505's classification of canine force is not materially inconsistent with Mr. Van Blaricom's report and the IACP's views. The Policy classifies the use of canines as an intermediate level of force equivalent to the use of batons, improvised weapons, and vascular neck restraints; that is a step above chemical agents and stun guns, and a step below the use of deadly force. [*See* Doc. 32, Ex. B at § VI.C.4.-6.] In a policy paper that Morris does not address, the IACP further explained its view of the use of canines, stating:

> Deployment of a police canine should be regarded as any other tool in the police officer's use-of-force arsenal. On a 'continuum of force,' deployment of a police canine should be considered a force option below that of deadly force and about equal to such less-lethal tools as the baton, stun gun, and carotid neck restraint.

[Doc. 44, Ex. N at 2.] Policy 505's classification of canine force is not inconsistent with the IACP standard, and the Policy is inconsistent with Van Blaricom's opinion only because Van Blaricom would classify canines above impact weapons. Given the IACP's views on this issue, and Van Blaricom's own acknowledgement that canines are properly below and less severe than deadly force, Van Blaricom's criticism does not create a genuine dispute as to whether Policy 505 is constitutionally deficient. Even if it could be said that Policy 505 minimally departs from accepted police practices, that is not enough. *See Soller v. Moore*, 84 F.3d 964, 969 (7th Cir. 1996) ("[W]hether it is wise public policy to allow off-duty officers to chase latenight [sic] traffic violators is beside the point; the action is not unconstitutional and, more to the point, it has nothing to do with the key issue of whether the force used ... is excessive under the circumstances.").

8

Morris has also failed to provide evidence that Policy 505's classification of canine force caused his alleged constitutional injury.   Morris argues that, by downplaying the potential harm a dog can do, Policy 505 led Opsahl to wrongly believe that deploying Bobby was warranted.   [*See* Doc. 37 at 19.]   But there is nothing in Policy 505 that affirmatively directed Opsahl to use Bobby in the circumstances.   The Policy places canine force in the context of other uses of force, and, together with Policy 935, establishes guidelines for the use of canines that handlers must follow while leaving them some discretion to deploy a canine given the situation confronting them.   This is not a situation where Opsahl was carrying out the express terms of the Policy.   Morris's causation theory is too attenuated from his alleged injuries to support a finding that Policy 505's canine classification was the "moving force" behind the constitutional violation.   *See City of Okla. City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985) ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell's* requirement that the particular policy be the 'moving force' behind a constitutional violation."); *Brown v. Whitman*, 651 F. Supp. 2d 1216, 1228-29 (D. Colo. 2009) (city policy concerning use of verbal warnings before deploying canine not "moving force" behind plaintiff's injuries because policy did not direct the action found to be unconstitutional).

Accordingly, municipal liability cannot be premised on Policy 505's classification of canines as intermediate force.

Morris also claims the Sheriff's policies are constitutionally deficient because they are "completely silent" regarding the proper procedure for deploying canines, including what crimes are deployable, how to develop tactical plans while using a canine, and providing instructions to other officers assisting the canine handler.   Morris also criticizes the policies

because they do not require the approval of a supervisor before deploying a canine, which, in his view, gives handlers "unchecked discretion." [Doc. 37 at 19.]

Policy 935, Section G states that canines "shall not be deployed off-leash" unless the handler has probable cause to believe that a suspect is actively resisting arrest, the canine is being assaulted, a felony or violent misdemeanor suspect is attempting to evade arrest by flight, or deployment is necessary to prevent any person from assaulting the handler, another policy officer, deputy or citizen. [Doc. 32, Ex. C, *supra* at 5.] Section I of Policy 935 requires handlers, before deploying a canine, to consider the severity of the crime involved; whether the suspect poses an immediate safety threat; and whether the suspect is actively resisting arrest or attempting to escape. [*Id.*] Policy 505 also applies to the use of canines, and forbids officers from "[using] more force than is reasonably necessary to subdue and apprehend a suspect." [Doc. 32, Ex. B, *supra* at 3.] Contrary to Morris' view, these policies speak directly to canine deployment issues and restrict a handler's discretion in their use. While the guidelines may not exhaustively discuss every circumstance or consideration attending the use of canines, and may depart in some respects from police practices, Section G of Policy 935 is identical to the model policy established by the IACP [*compare supra* at 5 *with* Doc. 44, Ex. M], Section I restates the use-of-force reasonableness test established by the Supreme Court in *Graham v. Connor*, 490 U.S. 386, 396 (1989), and Section 505 states the general excessive force standard under Supreme Court precedent. Morris' own expert, Mr. Van Blaricom, testified that he was "not critical of anything in this K-9 policy," [Doc. 44, Ex. O at 96:9-97:11]. These policies are not facially unconstitutional.

When a policy is not unconstitutional on its face, a plaintiff attempting to establish causation must show that the municipality consciously enacted the policy with deliberate

indifference to the rights of its citizens. *Brown*, 520 U.S. at 407 (quoting *City of Canton, Oh. v. Harris*, 489 U.S. 378, 388 (1989)).  Here, the rights of Summit County citizens appear to be protected by the limits on and guidelines regarding the use of canines imposed by the Sheriff's policies.  Although Morris has offered testimony criticizing the policies as not going far enough [*see* Doc. 37 at 20], those criticisms are rooted in public policy, not in the Fourth Amendment.

Accordingly, municipal liability cannot be premised on the Sheriff's policies regarding the use and deployment of canines.

Morris also claims that the Sheriff's canine policies are constitutionally deficient because they allow a handler to deploy a canine on a leash held in one hand while holding a firearm in the other.  [*See id.* at 21-22.]  In support, he cites the deposition testimony of Mr. Van Blaricom, who says that having a leash in one hand and a gun in the other is "a formula for disaster."  [*Id.*, Ex. 13 at 65:21-22.]  But it cannot be reasonably said, as Morris does in conclusory fashion, that "Deputy Opsahl shot his gun off because policy and training allowed him to be juggling his gun and his dog and the dog's leash."  [Doc. 37 at 11.]  The Sheriff's policy essentially left it to Opsahl's discretion on whether to draw his firearm while controlling Bobby and the leash, based on whether he was confronted with an immediate danger.  Exercising that discretion, Opsahl drew his gun because he was pursuing three fleeing men suspected of burglary and assault late at night; he shot his gun off by accident in chaotic circumstances.  A reasonable juror could not conclude that the Sheriff's policy concerning the simultaneous handling of a firearm and a canine was the moving force behind Morris' alleged constitutional injury.

2.  Underline{Failure to train}

Morris argues that the Sheriff inadequately trains its officers on the use of force and that the lack of training caused his constitutional injury.  [Doc. 37 at 22-25.]

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson,* ―― U.S. ――, 131 S. Ct. 1350, 1359, 179 L.Ed.2d 417 (2011).   To establish municipal liability under a failure to train theory, a plaintiff must show that:  (1) the municipality's training was deficient in a specific way, *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); (2) the officers exceeded constitutional limitations on the use of force; (3) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (4) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and (5) there is a direct causal link between the constitutional deprivation and the inadequate training.   *Allen v. Muskogee, Okla.,* 119 F.3d 837, 841–42 (10th Cir. 1997).

Morris' failure to train theory fails at the first element because he has not provided record evidence pointing to specific deficiencies in the Sheriff's canine training program.  The facts established by the Sheriff, which Morris does not dispute, demonstrate that the two Summit County canines were trained at Von Liche Kennels over a 14-week period; are certified in various types of tracking, searching, criminal apprehension and obedience; and are certified at the state and national level every year.  [*See* Doc. 32 at 7.]  The undisputed facts also establish that Opsahl received initial K-9 training in his police academy; 40 hours of training at a K-9 SWAT school in 2009; and was certified by the Colorado Canine Police Association in 2011.  [*See id.* at 6-7.]  It is also undisputed that Opsahl and Bobby train together 15-20

hours per month.  [*See id.* at 8.]  Given those undisputed facts, a reasonable juror could not find that the Sheriff's canine training program is so deficient as to be of constitutional magnitude.  Morris' complaints about how the Sheriff trains canine officers [*see* Doc. 37 at 23-25] are essentially a restatement of his unpersuasive arguments regarding the Sheriff's policies, above.

3.  Unconstitutional customs and practices

Morris also alleges that he was subjected to excessive force because of the Sheriff's informal customs or practices.  [*See id.* at 25-28.]  To establish municipal liability on the basis of custom or practice, a plaintiff must show:  (1) the existence of a continuing, persistent and widespread practice of unconstitutional misconduct by the municipality's employees; (2) deliberate indifference to or tacit approval of such misconduct by the municipality's policymaking officials after notice to the officials of that particular misconduct; and (3) that the plaintiff was injured by virtue of the unconstitutional acts pursuant to the custom and that the custom was the moving force behind the unconstitutional acts.  *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993).

Morris asserts that the Sheriff had a continuing, persistent, and widespread custom of allowing its handlers to engage in unconstitutional uses of canine force.  In support, he quotes a paragraph of Burwell's expert report in which Burwell says:

After reading numerous bite reports where Deputy Opsahl and police dog Bobby had bit suspects, I found that the Sheriff's Department is allowing Deputy Opsahl to operate inconsistent of that of the International Association of Chiefs of Police Canine Model Policy. The police dog is being used to bite persons on traffic stops and incidents that are not high risk felony suspects. The canine should not be deployed next to an intoxicated person who is only being questioned. See attached bite #2. The policy and procedures regarding canine deployments is outdated and does not follow the industry standards for using a find and bite police canine.

[Doc. 37 at 26 (quoting Ex. 10 at 7).]  Regarding the "numerous bite reports" Burwell refers to, there were in fact three of them from 2008, when Bobby started as a police canine, to April 26, 2011, when the incident with Morris occurred.  Neither side has been forthcoming about the details of the three prior incidents.  The record shows that one incident involved an intoxicated male suspected of domestic violence who advanced on Opsahl after Opsahl told him to stay away  [Doc. 37, Ex. 13 at 61:1-5]; and another dealt with a noncompliant female suspect who was in a bush and whom Bobby found, bit and dragged out  [*id.* at 197:20-198:11].  The parties have not described the third incident in their pleadings, and the Court has not been able to find a description of it in the record.

The Sheriff reviewed the three incidents and concluded that Opsahl's use of Bobby complied with departmental policies and procedures.  [*Id.* at 196:3-15.]  Morris has offered expert testimony from Ernest Burwell disagreeing with the Sheriff's conclusions; in Burwell's view, Opsahl should not have used Bobby in those situations to begin with.  Burwell's criticism stops short of saying the prior incidents resulted in constitutional violations, and the limited facts Morris has presented do not indicate that the use of Bobby amounted to "unconstitutional misconduct"; to the contrary, both suspects in the two prior incidents were noncompliant, and there is nothing to suggest that either incident resulted in a citizen complaint or a lawsuit.  In addition, Morris has failed to offer evidence showing that Sergeant Smith has misused his canine in the past, which undermines any inference that the Sheriff's purported practices are "widespread."  [*See* Doc. 37, Ex. 9 at 167:7-16.]  Accordingly, Morris has not met his burden of showing a "persistent and widespread practice of unconstitutional misconduct" by Summit County canine handlers such that the Sheriff is liable for Morris' injuries on the basis of custom.  *See Gates*, 996 F.2d at 1041.

14

Morris also argues that the Sheriff's response to the incident here demonstrates that the Sheriff had a custom of tolerating incidents of excessive canine force. [*See* Doc. 37 at 28-30.]  A municipality's post-incident conduct may provide circumstantial evidence regarding pre-existing customs or practices.  *See Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009).   But the Sheriff's response to the incident here cannot reasonably be considered deliberately indifferent.   The Sheriff assigned an investigation to the District Attorney, placed Opsahl on administrative leave, issued him a written warning, and required him to attend remedial classes.   Although Morris takes issue with the Sheriff's decision to not conduct an internal investigation, and to not discipline Opsahl more severely, the fact remains that the Sheriff did take remedial action following the incident, which precludes any inference that he believed Opsahl's conduct complied with municipal customs or practices.[3]

Morris analogizes to a few cases where a municipal custom was found by the court; each demonstrates the weakness of his custom theory.  In *Ortega v. City and County of Denver*, 944 F. Supp. 2d 1033 (D. Colo. 2013), the plaintiff presented testimony from Denver Police's independent monitor that the Department had a "systemic problem" of not holding officers accountable for their uses of force, citing "a number of cases" in which Denver's Internal Affairs Bureau rejected citizen complaints outright instead of properly investigating them.  *Id.* at 1039.  Here, Morris only has evidence of two prior uses of canine force by Opsahl that, on this record, do not seem particularly excessive, egregious, or comparable. While it takes fewer incidents to reasonably find a "systemic problem" in Summit County versus Denver, these two isolated incidents of questionable relevance are insufficient.

---

[3] Morris offers the deposition testimony of Captain FitzSimons as evidence that the Sheriff believed "there was no misconduct" in how Opsahl used Bobby.  [*See* Doc. 37 at 29 (quoting Doc. 37, Ex. 12 at 91:3-7).]  FitzSimons is not competent to testify as to the Sheriff's beliefs.

Morris also cites to *Starstead v. City of Superior*, 533 F. Supp. 1365 (W.D. Wisc. 1982), where the plaintiff alleged a systemic pattern of misuse of police dogs on the basis of five separate incidents involving seven different people. *Id.* at 1369-70.  Here, the only evidence of purported misconduct involves Opsahl.  There is no allegation of separate incidents involving other Sheriff's deputies like Sergeant Smith misusing canines.

Finally, Morris cites to *Kopf v. Wing*, where the plaintiff proved the existence of a custom on the basis of statistics tending to show that a substantial percentage of citizen complaints regarding the use of excessive force were rejected by the county.  942 F.2d 265, 269 (4th Cir. 1991).  Here, Morris provides no evidence on the number of canine deployments that have resulted in canine bites versus the total number of deployments, the number of internal investigations the Sheriff has undertaken regarding canine deployments or bites, or any other facts that would support his custom or practice allegations.

Accordingly, Morris cannot prevail on his municipal liability claim on the basis of custom or practice.

4. Ratification

Morris argues that the Sheriff ratified Opsahl's conduct by outsourcing an investigation of the incident to the District Attorney instead of investigating the matter internally, and because he chose not to discipline Opsahl.  [*See* Doc. 37 at 41-51.]  Municipal liability can be found if a final municipal policymaker ratifies the conduct or decision of a subordinate and the basis for it.  *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010).  In *Melton v. City of Oklahoma City*, 879 F.2d 706, 725 (10th Cir. 1989), the Court concluded that City Manager ratified the Chief of Police's firing of the plaintiff because the Police Chief "met with the City Manager and discussed the proposed dismissal .

16

. .” and the “City Manager expressly approved such dismissal,” which then occurred.  Here, there is no evidence showing that Sheriff Minor knew of Opsahl’s use of force and expressly approved it before Opsahl took action.  Morris’ ratification theory is essentially that the Sheriff failed to investigate or discipline Opsahl after the fact, but “basic [principles] of linear time” prevent a court from finding that conduct occurring after an alleged violation could have somehow been the cause of it.  *Cordova*, 569 F.3d at 1194; *see also Butler v. City of Norman*, 992 F.2d 1053, 1055-56 (10th Cir. 1993) (rejecting argument that supervisor was liable for officer’s excessive force because supervisor did not discipline officer following incident); *Trujillo v. Campbell*, No. 09-cv-03011, 2012 WL 3609747, at *8 (“Although Plaintiff raises legitimate questions about the thoroughness of Denver's investigation . . ., the Court is unable to perceive how a lackluster post-shooting investigation could have caused Officer Campbell to violate Mr. Gomez's Fourth Amendment rights.”).

For the foregoing reasons, it is

ORDERED that Defendant Sheriff of Summit County’s Motion for Summary Judgment [Doc. 32] is granted.  The Clerk will enter judgment dismissing the Sheriff from this civil action.

Dated:  February 21, 2014.

BY THE COURT:

**s/**Richard P. Matsch
_____

Richard P. Matsch
Senior District Judge